**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2366-19
A-2378-19

FTERA ADVISORS, LLC,

     Plaintiff-Respondent,

v.

SCOTT CAPUTO, SCOTT
STRAKA, ALTILIUM POWER
DEVELOPMENT, LLC, NEW
JERSEY BATTERY ENERGY
STORAGE PROJECT ONE, LLC,
NEW JERSEY BATTERY
ENERGY STORAGE PROJECT 2,
LLC, MSS CAPITAL, LLC and
APD FLEMINGTON, LLC,

     Defendants-Appellants,

and

ALTILIUM POWER
DEVELOPMENT, LLC,

     Third-Party Plaintiff/
     Appellant,

v.

ALEKSY N. KRYLOV, FTERA
ENERGY APD FLEMINGTON, LLC
and ALTILIUM ENERGY, LLC,

      Third-Party Defendants/
      Respondents.

_____

Submitted February 22, 2021 – April 28, 2021

Before Judges Fasciale and Rothstadt.

On appeal from the Superior Court of New Jersey,
Chancery Division, Essex County, Docket No. C-
000199-18.

Lindgren, Lindgren, Oehm, & You, LLP, attorneys for
appellants Altilium Power Development, LLC and ADP
Flemington, LLC (Christian R. Oehm, on the briefs).

Greenberg Traurig, LLP, attorneys for appellants Scott
Caputo, Scott Straka, New Jersey Battery Energy
Storage Project One, LLC, New Jersey Battery Energy
Storage Project 2, LLC and MSS Capital, LLC (Paul H.
Schafhauser and Paige Nestel, of counsel and on the
briefs).

Curcio, Mirzaian, Sirot, LLC, attorneys for respondents
(Jason S. Haller, of counsel and on the briefs).

PER CURIAM

These two appeals, which we considered "back-to-back" and have now

consolidated for the purpose of writing one opinion, present a challenge to the

Chancery Division's January 2, 2020 order that dissolved a previously entered

temporary restraint and denied preliminary injunctive relief to defendants. Judge Jodi Lee Alper, the Chancery judge, entered the order after determining that defendants had extinguished their right of first refusal under a settlement agreement with plaintiff by not following the agreement's requirements for its exercise, thereby defeating their claim for injunctive relief under Crowe.[1]  As described herein, on appeal defendants assert numerous reasons why they believe the Chancery judge erred.  We reject their contentions and affirm, as we conclude the judge properly determined defendants did not exercise their rights and failed to meet their burden under Crowe.

## I.

In order to give context to our opinion, we are constrained to provide a detailed recitation of the facts from the record.  At the outset, we identify the parties and their relationships, the history of their transactions, the project they pursued, and their earlier litigation before we reach the settlement agreement upon which the parties' claims and defenses are based.

### The Parties

Plaintiff FTERA Advisors, LLC (FAL), FTERA Energy APD Flemington, LLC (FEAPD), and Altilium Energy, LLC (AEL), are companies managed by

---

[1]  Crowe v. De Gioia, 90 N.J. 126 (1982).

FAL's sole member, third-party defendant Aleksy Krylov. Defendants are Scott Caputo and Scott Straka, and their related companies, defendants NJ Battery Energy Storage Project One, LLC, NJ Battery Energy Storage Project 2, LLC (collectively, Battery), MSS Capital, LLC (MSS), third-party plaintiff Altilium Power Development, LLC (APD), and APD Flemington, LLC (APD Flemington). APD's members are MSS, Battery, and FAL. Straka is the sole member of Battery[2] and Caputo is the sole member of MSS.

All defendants and APD have appealed from the Chancery judge's order, which denied their application for injunctive relief restraining Krylov and his entities from alienating FEAPD. Their right to such relief turned on whether they had a right of first refusal to acquire FEAPD and the project that APD, and later FEAPD, were formed to pursue or sell, and, if so, whether they exercised it in accordance with the underlying contract, which was a settlement agreement that resolved the earlier litigation between the parties.

<u>The Project</u>

In February 2018, Caputo, Straka, and Krylov entered into discussions about constructing a battery energy storage facility in Flemington. Caputo and

---

[2] In or around September 2018, Straka transferred Battery 1's interest in APD to Battery 2.

A-2366-19

Straka, who were familiar with the industry and had contacts in it, did not have funds to contribute so they approached Krylov who, upon hearing the pair's plans for the facility, agreed to provide the necessary financial backing. The three formed APD on or about March 23, 2018, designating FAL, Battery, and MSS as its members, in order to build "a battery energy storage system . . . which would be connected to the electrical power grid," (the Project). The plan called for APD to "ultimately generate revenue by providing certain balancing, frequency regulation[,] and other services to the power grid." Its operating agreement designated Krylov as Chief Executive Officer.

The parties simultaneously formed APD Flemington with APD as its sole member in order to hold the rights to the land on which the Project would be built. APD Flemington's operating agreement similarly designated Krylov as the managing director.

On March 29, 2018, APD Flemington entered into a lease and purchase agreement with Raritan Parkway Properties, LLC (RPP) for a certain property in Raritan Township. APD estimated that it would need to raise between ten and fifteen million dollars in order to build the Project on that property. Alternatively, the plan was to sell the lease and rights to connect the facility to the electrical grid without having to raise the money to construct the Project.

5 <span>A-2366-19</span>

In order to complete the Project, APD needed to apply to PJM Interconnection, LLC (PJM) for the purpose of connecting to the electrical power grid.[3] At some point, APD was issued an "interconnection queue position" (IQP) for the Project's connection to the electrical power grid. APD's primary assets were therefore the IQP and APD Flemington's rights under the RPP lease.

Soon thereafter, disputes arose between the individuals over whether to pursue development of the project or to sell it to a third party. One prospective buyer, Viridity Energy Solutions, Inc. (VESI), presented a term sheet outlining its offer to purchase the Project (First Term Sheet). The purchase price was to be $800,000 plus residual payments from operations. Caputo and Straka wanted to sell, but Krylov did not.

Following Krylov's refusal to sell the Project to VESI pursuant to the First Term Sheet, APD held a member vote on September 22, 2018, at which Battery and MSS voted to remove Krylov as CEO of APD and replace him with Caputo. On the same day, Caputo, as the newly appointed representative for APD, executed the First Term Sheet with VESI. Days later, Krylov formed FEAPD

---

[3] According to the parties, PJM is "an entity that coordinates the interstate movement of wholesale electricity."

A-2366-19

and, according to Caputo and Straka, purportedly transferred all of APD's rights in the project to the new entity, including the IQP and the RPP lease.

The Litigation, Settlement Agreement and Right of First Refusal

Thereafter, in November 2018, FAL filed a complaint against Caputo, Straka, APD, Battery, MSS Capital, and APD Flemington. The next month, Krylov allegedly formed AEL. On January 29, 2019, APD filed an amended answer asserting affirmative defenses and counterclaims against FAL, and a third-party complaint asserting claims against Krylov, FEAPD, and AEL.

On April 26, 2019, the parties resolved the litigation by entering into a settlement agreement that contemplated a sale of the Project to VESI. Paragraph one of the agreement stated that, upon Krylov receiving the first $200,000 of the purchase price paid by VESI, defendants would receive the balance of the purchase price and FEAPD would "assign all rights of payment, and, to the extent not required by VESI, all rights in the Lease with [RPP] and to the [IQP with] PJM to any Defendant other than [APD] or to a new entity to be design[ated] by the [d]efendants."

Paragraph two of the settlement agreement addressed any "[d]efault by VESI" and provided that if one occurred, defendants waived any rights or interest in FEAPD, except that they would have "a right of first refusal" to

acquire FEAPD from Krylov if certain conditions were met. It stated the following:

> In the event VESI fails to provide confirmation of the initiation of a wire transfer to PJM by 12:00PM on April 26, 2019 or fails to close on the purchase of [FEAPD, FEAPD] has the right to repay VESI any balance extended with respect to the PJM Facility Study Deposit which has not been refunded by PJM and to thereafter claim against VESI, to sell [FEAPD] or the Project to any purchaser of [FEAPD] or the Project selected by [FAL] or [FEAPD] without any claim of any of the Defendants. In such default context, Defendants acknowledge and agree that they waive any right or interest with respect to [FAL, FEAPD], Krylov, or [AEL], except that, <u>in the event that Defendants pay their pro-rata share of any reimbursement to VESI</u> (based upon their percentage voting ownership in [APD]), or, if no reimbursement is required, <u>Defendants shall have a right of first refusal for a period of [thirty] days to buy out the interest of Krylov in [FEAPD] for a total of the greater of (a) $260,000 or (b) cash value of (i) 31.6% ownership in [FEAPD] based upon the highest available arms-length independent third party offer to acquire [FEAPD] and (ii) related expenses incurred to date.</u>

> [Emphasis added.]

On the same day the parties entered into the settlement agreement, FEAPD, through Krylov, and VESI executed a new summary term sheet (Second Term Sheet) detailing the contemplated sale to VESI of FEAPD, including the IQP and RPP lease. The Second Term Sheet called for a $600,000 purchase

price to be paid over time, and for VESI to deposit $50,000 with PJM for a "facilities study," which it did shortly after execution of the term sheet.

Three days later, the parties filed a stipulation of settlement which incorporated the settlement agreement by reference and stated that the claims, counterclaims, actions, and causes of action between the parties were "settled upon the terms set forth in" the settlement agreement.

<u>Litigation Over the Settlement Agreement</u>

After executing the settlement agreement, Krylov continued negotiations with VESI. Eventually the parties reached an impasse and negotiations were terminated. On October 17, 2019, Krylov forwarded Straka and Caputo an email from VESI attaching a Membership Interest Purchase and Sale Agreement (MIPSA) and informing Krylov that if the terms in that agreement, which were different than the Second Term Sheet's, were not accepted by the end of the day on October 18, 2019, VESI would contact PJM to withdraw from the project. The next day, VESI emailed PJM notifying it that VESI's negotiations with FEAPD had failed, and that it therefore sought reimbursement of their $50,000 facilities study deposit, destruction of the project drawings it supplied, and withdrawal of the IQP.

A-2366-19

That same day, counsel for Caputo and Straka contacted Krylov regarding the latter's failure to close on the sale with VESI and informed him that Caputo and Straka intended to act on paragraph two of the settlement agreement under which they "ha[d] thirty (30) days to purchase [Krylov's] interests in [FEAPD]." Rather than paying the $260,000 contemplated by paragraph two of the settlement agreement, Caputo and Straka attempted several times to renegotiate the terms of a buyout of Krylov's interest in FEAPD. In response, Krylov explained that defendants were not in a position to negotiate buying out his interest in the company, as they had not paid the $34,000 to VESI in reimbursement as required to even obtain the right of first refusal. As such, Krylov refused to accept each of the proposed modified arrangements because they were not in compliance with the settlement agreement and informed defendants that their right to buy his interest in FEAPD only "kick[ed] in" after reimbursing their share of the VESI, whereupon they could then buy his interest for $260,000.

A week later, Krylov sent defendants an email indicating that VESI had threatened to "start filing lawsuits" and informed defendants that he would need "something in writing" that defendants would have a replacement for their share of the $50,000 facilities study deposit VESI had made. Counsel for Caputo and

Straka emailed Krylov to notify him that Caputo and Straka had deposited $34,000 into a trust account on October 28, 2019.

Shortly thereafter, VESI filed a complaint against FEAPD seeking monetary damages from FEAPD and Krylov. After its filing, the parties again discussed Caputo and Straka's buyout of Krylov's interest in FEAPD under the settlement agreement in a series of emails they exchanged between November 4 and November 7, 2019. In one email, defendants offered to pay Krylov $155,400 for his interest in FEAPD, the RPP lease and the IQP, and an additional $155,400 to VESI in exchange for VESI dismissing its lawsuit against Krylov. Krylov rejected the offer.

On November 13, 2019, five days before the expiration of the thirty-day period stated in the settlement agreement, Krylov emailed defendants to inform them that he was "inclined to let PJM cancel the facility study and refund the deposit to [VESI] . . . unless [defendants] [we]re willing to act on [the] rights available to them under the settlement agreement."

<u>The Award of Temporary Restraints</u>

Also on November 13, 2019, APD filed an application for entry of an order to show cause seeking temporary restraints on Krylov's ability to sell FEAPD, including its IQP and the RPP lease. It also sought an order

"[e]nforcing the parties' April 26, 2019 [s]ettlement [a]greement;" "[a]ppointing an independent agent to act on behalf of [FEAPD]and [Krylov] to facilitate the enforcement of the April 26, 2019 [s]ettlement [a]greement and to hold those necessary items obligated to be delivered by [d]efendants . . . in escrow pending the outcome of the matter" between VESI and FEAPD.

In support, APD submitted a certification from Caputo, which stated that he and the other defendants were seeking emergent relief to protect their rights under the settlement agreement and to enforce the agreement. He explained that defendants had "substantially complied" with the settlement agreement and "tendered necessary items in fulfillment of their obligations." He certified that FEAPD and Krylov failed to close on the terms sheet attached to VESI's complaint and following the failure to close, defendants "acted in accordance with and pursuant to the relevant provisions of the [s]ettlement [a]greement."

Defendants also represented that they had the funds necessary to make the purchase and had confirmed same to Krylov in emails that would be produced on the return date. Specifically, defendants' attorney advised the Chancery judge that they "[a]bsolutely . . . ha[d] all [of] the proof" that defendants had acted "within thirty days" to "buy out [Krylov's] interest [in FEAPD] . . . for a total of . . . $260,000."

A-2366-19

Based on defendants' representations, Judge Alper granted the temporary restraints on November 19, 2019, reasoning that "it appear[ed] that the [defendants we]re attempting to act under paragraph two of the settlement agreement and attempting to exercise their right of first refusal." She found that there could be irreparable harm to defendants if they were not permitted to exercise their right, but she made no findings on the ultimate success on the merits. She concluded that Krylov and FEAPD could not "take any action to sell, merge, convert, transfer, dissipate, encumber[,] or otherwise dispose of [FEAPD]" pending the January 2, 2020 return date of the order to show cause.

The Dissolution of the Restraints and Denial of a Preliminary Injunction

Following the hearing, defendants' counsel wrote to Krylov's attorney with yet another settlement proposal. He stated that defendants had "approximately $311,000" at their disposal and that Krylov could "divide the money between himself and VESI as he may." Krylov's attorney did not respond.

On December 13, 2019, FAL filed a motion to dissolve the temporary restraints. In a supporting certification, Krylov stated the parties' settlement agreement provided that FAL would receive the first $200,000 from the VESI sale, with the remaining right to payments assigned to defendants. According

13

to Krylov, after VESI emailed PJM for return of their money and drawings and the withdrawal of the PJM IQP, he contacted PJM and instructed them not to follow VESI's instructions in order "[t]o save the project." He also stated that VESI sued him and FEAPD on November 4, 2019, but on December 5, 2019, he had a phone call with VESI's parent company, Ormat Technologies, Inc. (Ormat), and they were "able to come to a[n] . . . agreement—conditioned on th[e trial c]ourt's dissolving the restraints—that would allow the deal to close on the original terms and the separate lawsuit against [him would] be dismissed."

FAL also submitted a certification from Ormat's counsel, Jessica Woelfel who stated that pursuant to the Second Term Sheet, VESI had deposited $50,000 with PJM and obtained engineering studies to allow VESI to develop the FEAPD property for electrical storage. She added that VESI filed a complaint against FEAPD and Krylov, and thereafter, a temporary restraining order was entered against Krylov to enjoin him from selling his interest in FEAPD. She also explained that "the impasse between Krylov and VESI ha[d] been resolved." As such, VESI had drafted a final MIPSA, and had authorized the dismissal of its complaint without prejudice upon the closing of the MIPSA deal. She also certified that VESI was "ready, willing[,] and able" to execute the MIPSA when the temporary restraints were dissolved.

14

During oral argument on the return date of both the order to show cause and the motion to dissolve the restraints, counsel for APD and APD Flemington explained that defendants deposited $34,000 "representing their contribution to the $50,000.00 advanced by [VESI] to PJM in accordance with the terms of the [settlement agreement.]" However, counsel represented that defendants did not have "any actual verifiable means from [VESI] as to what [defendants'] contribution would actually be," aside from "the word of [Krylov] who has not acted in good faith and has not acted with clean hands throughout this entire proceeding." Instead, they asserted that Krylov was "causing conditions that [we]re preventing [defendants] from exercising their rights."

In response to the judge's inquiry as to whether his clients "put $260,000.00 in escrow within thirty days of October 18th," counsel responded, "[n]o" but explained that putting $260,000 in escrow was not a requirement of the settlement, and defendants "did everything that they were supposed to do." He added that defendants had a "letter of credit from [an] investor" in the amount of $300,000. The letter of credit was not part of any submission to the judge.[4]

In placing her decision on the record, Judge Alper explained that the parties entered into a settlement agreement on April 26, 2019, and the agreement

_____

[4] This letter of credit is also not included in the record on appeal.

included a right of first refusal in paragraph two. She read from that paragraph and explained the following:

> There is no condition in this language regarding the closing by [VESI] of its purchase of the project. The language clearly states simply that if [VESI] fails to close on the purchase then [FAL] here has the right to repay [VESI] the balance due for the facility study deposit and then [FAL] . . . retains its right to take over the project without any claim of the defendants.

As to defendants' right of first refusal, she explained that the agreement provided that defendants "shall have a right of first refusal for a period of thirty days to buy out the interest of [Krylov] and [FEAPD] for a total of the greater of [(a)] $260,000.00 or [(b)] cash value of . . . 31.6 percent ownership in [FEAPD] based upon the highest available arms-length independent third party offer."

Judge Alper then explained that the relief sought sounded in both breach of contract and in equity. She stated that "[t]he relief that's being requested in the view of the [c]ourt is not at this point equitable relief," noting that the parties agreed the settlement agreement controlled the motions before her and that both parties "anchored their relief" in the settlement agreement. But then she added "[t]he [c]ourt also finds that the relief that's being requested is equitable relief." She then explained that defendants were seeking an injunction and that any

16

injunctive relief was "bound by the cases that are precedential for such relief," such as Crowe.

The Chancery judge concluded that she would not enter a preliminary injunction and would set aside the temporary restraints. She found that the relief defendants requested sounded "firmly in a breach of contract" and they had not shown irreparable harm, but instead that the relief they were seeking was "strictly monetary and c[ould] be addressed through monetary damages." She added, "[a]s I understand the representations of the . . . parties, the right of first refusal was required to be exercised within thirty days of October [18], 2019[,] as specifically set forth in paragraph [two] of the settlement agreement."

Applying the other Crowe factors, Judge Alper found that the right of first refusal was a well-settled legal right, but she explained that she did not find that defendants exercised that right. She also found "it noteworthy that there were no conditions put on the obligation of [VESI] to purchase the project." She explained that "[t]he language is . . . clear in the settlement agreement that if [VESI] fails to provide confirmation of the initiation of a wire transfer or fails to close on the purchase then [FEAPD] has the right to certain relief subject to the right of first refusal."

 A-2366-19

Additionally, the judge did not find that defendants established a reasonable probability of success because they did not demonstrate that they complied with the right of first refusal and because the relief that was being requested "sound[ed] in monetary damages not in equity." As to balancing the hardships of the parties, she found that the balance was in favor of FAL and Krylov, who "negotiated the settlement agreement and defendants had the right to comply with the agreement" but failed to comply. These two appeals followed.

On appeal, defendants collectively, and some individually, raise various arguments. Essentially, they argue that the Chancery judge misinterpreted the settlement agreement, erred by finding they did not exercise their right of first refusal, and failed to consider Krylov's conduct that allegedly prevented them from exercising their right. Additionally, they contend that the judge erred by finding they did not satisfy their burden for a temporary injunction and by failing to conduct a plenary hearing. In addition, APD and APD Flemington assert that the Chancery judge erred when she found no equitable relief was available to them and by failing to explain her reasons for dissolving the temporary restraints. Defendants also argue that it was an abuse of discretion for the judge to dissolve the restraints under the doctrine of unclean hands. Finally, some of

them contend the judge erred and abused her discretion in allowing the forfeiture of defendants' settled contractual right of first refusal. We are not persuaded by any of their contentions.

II.

When determining whether a party is entitled to preliminary injunctive relief, a court must consider the four Crowe factors. See Garden State Equal. v. Dow, 216 N.J. 314, 320 (2013) (reiterating the factors outlined in Crowe, 90 N.J. at 132-34). First, "a preliminary injunction should not issue except when necessary to prevent irreparable harm." Crowe, 90 N.J. at 132. As the Crowe Court explained, harm is "generally considered irreparable in equity if it cannot be redressed adequately by monetary damages." Id. at 132-33. Second, "temporary relief should be withheld when the legal right underlying plaintiff's claim is unsettled." Id. at 133. Third, a "preliminary injunction should not issue where all material facts are controverted." Ibid. Under the third factor, "to prevail on an application for [preliminary] relief, a plaintiff must make a preliminary showing of a reasonable probability of ultimate success on the merits." Ibid. Fourth and finally, a court must consider the "relative hardship to the parties in granting or denying relief." Id. at 134.

The moving party has the burden to establish each of the Crowe factors by clear and convincing evidence. Brown v. City of Paterson, 424 N.J. Super. 176, 183 (App. Div. 2012). However, "'a court may take a less rigid view' of the Crowe factors and the general rule that all factors favor injunctive relief 'when the interlocutory injunction is merely designed to preserve the status quo.'" Waste Mgmt. of N.J., Inc. v. Morris Cnty. Mun. Utils. Auth., 433 N.J. Super. 445, 453 (App. Div. 2013) (quoting Waste Mgmt. of N.J., Inc. v. Union Cnty. Utils. Auth., 399 N.J. Super. 508, 520 (App. Div. 2008)).

We review a trial court's decision to grant or deny a preliminary injunction for an abuse of discretion. Id. at 451; see also Rinaldo v. RLR Inv., LLC, 387 N.J. Super. 387, 395 (App. Div. 2006). A court abuses its discretion "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

However, where the decision to grant or deny injunctive relief turns on the construction and interpretation of a settlement agreement, which is a matter of law, our review is de novo. Kaur v. Assured Lending Corp., 405 N.J. Super. 468, 474 (App. Div. 2009). As such, "[a] 'trial court's interpretation of the law

and the legal consequences that flow from established facts are not entitled to any special deference.'" Ibid. (quoting Alfano v. BDO Seidman, LLP, 393 N.J. Super. 560, 573 (App. Div. 2007)). We "give 'no special deference to the trial court's interpretation and look at the contract with fresh eyes.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)).

## III.

We first address defendants' contention that the Chancery judge misinterpreted the settlement agreement and therefore found they had not exercised their right of first refusal in light of the fact they posted their share of the reimbursement to be paid to VESI. They argue that their further performance of the purchase was excused by "[p]laintiff clearly express[ing] his intent not to honor [their] rights and interests unless they paid him $400,000." We disagree with their contentions.[5]

---

[5] Defendants also argue for the first time on appeal that Krylov's demands for more money excused their performance under the doctrines of impossibility and frustration of purpose by virtue of VESI filing suit against Krylov. Because these doctrines were not argued before the Chancery judge we do not consider them on appeal. Nieder v. Royal Indem. Ins., 62 N.J. 229, 234 (1973); Correa v. Grossi, 458 N.J. Super. 571, 576 n.2 (App. Div. 2019). Even if we did, we find the contention has no merit, as the settlement agreement clearly contemplated a situation where VESI would not go through with the purchase. See Capparelli v. Lopatin, 459 N.J. Super. 584, 606-07 (App. Div. 2019).

At the outset, we note that "[g]enerally, a settlement agreement is governed by principles of contract law." Brundage v. Est. of Carambio, 195 N.J. 575, 600-01 (2008) (quoting Thompson v. City of Atl. City, 190 N.J. 359, 379 (2007)). "Fundamental to our jurisprudence relating to settlements is the principle that '[t]he settlement of litigation ranks high in our public policy.'" Id. at 601 (alteration in original) (quoting Jannarone v. W.T. Co., 65 N.J. Super. 472, 476 (App. Div. 1961)). Therefore, "absent a demonstration of 'fraud or other compelling circumstances,' [we] should honor and enforce" them. Pascarella v. Bruck, 190 N.J. Super. 118, 124-25 (App. Div. 1983) (quoting Honeywell v. Bubb, 130 N.J. Super. 130, 136 (App. Div. 1974)).

According to well-settled principals of contract law, "[c]ourts enforce contracts 'based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" Matter of Cnty. of Atl., 230 N.J. 237, 254 (2017) (alteration in original). Courts interpreting contracts are generally required to give the terms "their plain and ordinary meaning." E. Brunswick Sewerage Auth. v. E. Mill Assocs., Inc., 365 N.J. Super. 120, 125 (App. Div. 2004). If the contract language is clear, it must be enforced as written. Ibid. But if the language is "ambiguous, 'courts will consider the parties' practical construction of the contract as evidence of their

A-2366-19

intention and as controlling weight in determining a contract's interpretation.'" Matter of Cnty. of Atl., 230 N.J. at 255 (quoting Cnty. of Morris v. Fauver, 153 N.J. 80, 103 (1998)).

As with any contract, a reviewing court may not rewrite a settlement agreement "to provide a better bargain than contained in [the parties'] writing." Kaur, 405 N.J. Super. at 477 (quoting Grow Co. v. Chokshi, 403 N.J. Super. 443, 464 (App. Div. 2008)). But, courts of equity are not required to enforce contracts when doing so would result in a manifest injustice or would impose a great hardship. E. Brunswick Sewerage Auth., 365 N.J. Super. at 125.

Also guiding our review in this action is the fact that the parties' dispute is over what the parties labeled as a right of first refusal, which upon closer look is more akin to an option to purchase. The primary difference lies in the holder of the right's ability to compel a sale. "A privilege of first refusal does not give the holder of the privilege the power to compel the owner to sell. It merely requires the owner, if and when he decides to sell, to offer the property to the holder at a stipulated price." Madison Indus., Inc. v. Eastman Kodak Co., 243 N.J. Super. 578, 586-87 (App. Div. 1990).

"An option is a binding unilateral contract whereby the owner offers to sell to the optionee at a specified price in the event the latter exercises the option,

whether the owner is willing to part with ownership or not. . . . The option is unilateral because the owner is bound by his offer, but no obligation is imposed upon the optionee." Id. at 587 (emphasis omitted).

Typically, the buyout price under a right of first refusal is simply the price offered by a third-party offeror; but here, the price was set by the settlement agreement—further persuading us that the so-called right of first refusal is, in fact, an option. See Mazzeo v. Kartman, 234 N.J. Super. 223, 229-30 (App. Div. 1989) ("Very often it is clearly provided that B shall have a Right of First Refusal at the same price and on the same terms as those of an offer by a third person that O is willing to accept." (quoting 1A Corbin on Contracts § 261 at 470 (1963))). The exercise of a right of first refusal must await a seller's tender of the property after receiving an offer from a third party. See Id. at 229 ("[T]he right of first refusal has no binding effect unless the offeror decides to sell. . . . It limits the right of the owner to dispose freely of his property by compelling him to offer it first to the party who has the first right to buy." (quoting 11 Williston on Contracts § 1441A at 948-50 (Jaeger ed., 3d ed. 1968))). With an option, "[b]ecause the property owner cannot withdraw the offer, we require the option holder, who is 'free to accept or reject,' to adhere strictly to the terms of the contract." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr.

Assocs., 182 N.J. 210, 223 (2005); see also Goodyear Tire & Rubber Co. v. Kin Props., Inc., 276 N.J. Super. 96, 105 (App. Div. 1994).

Here, although defendants argue their performance was excused by Krylov's alleged demands for more money, the plain language of the settlement agreement clearly stated once VESI did not proceed with the purchase by making the required payments, defendants had a right to purchase Krylov's interest in FEAPD during the thirty days following VESI's default at a specific price, the minimum of which was $260,000. If not exercised during that time, defendants' right to purchase expired. That language created an option, and as such, defendants were bound to exercise it in strict accordance with the settlement agreement.

As Judge Alper found, defendants failed to do so by not ever tendering to Krylov the $260,000, which was required in light of the fact there were no other purchasers offering a higher price. Defendants not only failed to tender the purchase price, they also failed to even deposit the amount in trust to demonstrate their ability to perform.

Contrary to defendants' argument, the fact that they placed the $34,000 to reimburse VESI in escrow did not constitute an exercise of the option. That

$34,000 payment, according to the agreement's plain language, only gave rise to their option. Had they not made that payment, no right to purchase existed.

Under these circumstances, and contrary to defendants' contention on appeal, without any proof that they tendered the purchase price and Krylov rejected the payment, it did not matter what Krylov allegedly otherwise did or said about what he wanted that was inconsistent with the terms of the settlement agreement. In any event, Krylov acknowledged defendants' right to purchase when he wrote to them five days before the option period expired seeking payment in accordance with the settlement agreement.

Without even an attempt to tender the purchase price within the specified time period, defendants did not have any settled rights, nor could they demonstrate a likelihood of success on the merits that warranted the imposition of preliminary restraints. See Crowe, 90 N.J. 133-34; Brown, 424 N.J. Super. at 183. Contrary to defendants' argument on appeal, the imposition of injunctive relief to preserve their interest in the RPP lease was unwarranted. Without exercising the option to purchase, they had no rights—having expressly waived them in paragraph two of the settlement agreement—except for their right to purchase, which, again, they did not exercise.

Finally, we find no merit to defendants' claim that the doctrine of unclean hands applied to Krylov's demands for more money than required in the settlement agreement or to his conduct that led to VESI initially withdrawing from the purchase. The doctrine of unclean hands provides "that a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit." Borough of Princeton v. Bd. of Chosen Freeholders of Mercer, 169 N.J. 135, 158 (2001) (quoting Faustin v. Lewis, 85 N.J. 507, 511 (1981)).

Although the record certainly contains multiple examples of Krylov sending defendants proposals to buy out his interest for amounts well above those contemplated by the settlement agreement, it also demonstrates defendants' offers to pay less than the contract amount. These negotiations do not evidence any interference with the exercise of defendants' right of first refusal nor an unambiguous repudiation of Krylov's contractual duties which would justify defendants' nonperformance. Spring Creek Holding Co. v. Shinnihon U.S.A. Co., 399 N.J. Super. 158, 178 (App. Div. 2008) (citing Ross Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 340-41 (1961)). To the contrary, as late as five days before the thirty-day period expired, Krylov expressly recognized defendants' rights and, significantly, he never indicated he would reject the $260,000 price stipulated in the settlement agreement if it was offered.

27

We conclude that, in light of the undisputed fact that defendants did not perform in strict compliance with the settlement agreement, Judge Alper properly denied injunctive relief and was justified in not conducting a plenary hearing before doing so. See Jacoby v. Jacoby, 427 N.J. Super. 109, 123 (App. Div. 2012) (internal quotation marks omitted) (quoting Shaw v. Shaw, 138 N.J. Super. 436, 440 (App. Div. 1976)) (stating plenary hearings should be ordered "only where the affidavits show that there is a genuine issue as to a material fact, and . . . the trial judge determines that a plenary hearing would be helpful in deciding such factual issues").

To the extent we have not specifically addressed any of defendants' remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We only observe that, as Judge Alper found, to the extent that Krylov proceeded with a sale, defendants may have a claim for breach of contract and perhaps other causes of action that, if proven, can adequately be remedied through an award of damages.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

28

A-2366-19